We're here on a death penalty case, number 1770010, Dennes v. Davis, and you gentlemen are fully aware of our time constraints, and you have plenty of time for your arguments in my view, but we would appreciate record citations when those are appropriate. And with that, we will call Mr. McGuire for the petitioner. Good morning, Your Honors. In honor and learning of counsel, may it please the Court. This case is primarily about many different types of suppressed evidence that were suppressed by Harris County District Attorney and the Houston Police Department in Mr. Dennes' case. They were not revealed, most of those instances, until federal habeas when we were able to get federal subpoena power and were able to access some of these records. That's why they were not . . . It took 16 years to get the thing resolved in state court, did it not? Yes, Your Honor. I was not involved in that. I don't know why it took so long. I believe it was over 10 years sitting in front of the CCA, something like that. It was a long time. And I was not representing Mr. Dennes at that time. But, Your Honors, our position is that we've exhausted some of these facts. Additional facts came out in federal habeas that are intertwined with the facts that were presented in the direct appeal for Mr. Dennes that further bolster that claim. We believe, for example, the letter, the July 1996 letter from Todd Miller to Chuck Rosenthal, who was the prosecutor at the time, discussing their interview with Mr. Balderas, who was a key factor. When was that, 1996? The interview by the letter from Todd Miller, Your Honor, who was one of the lead detectives in the case, was in July of 1996, which was before the August 97 trial date. And Mr. Odom and Mr. Parnum, who were trial counsel for Dennes and his brother, requested Brady disclosures which the court ordered in the January 1997 pretrial hearing. And Mr. Vinson, who was then the prosecutor had taken over from Mr. Rosenthal, promised to comply with Brady and said he would. And the judge ordered him to comply with Brady. And that was not done in a variety of different instances, primarily concerning Mr. Balderas, who was undisclosed that he was a lawman. What was the defense given five days before trial? Yes, Your Honor. They were disclosed the fact that there was this offense that they had been asking about. They were disclosed, finally, the offense report. The attack. The Tsang home invasion. Yes, Your Honor. Now, did they get an offense report at that time? They were not provided an offense report. It was not the policy of Harris County DA's office to provide it. They would let you look at it and make notes off of it. And then you would have to, in effect, verbatim hand copy it, which I've done many times in many cases. Did they get to look at it? They allow you to look at it, Your Honor. Yes. You're not allowed to keep a copy of  You don't know if they looked at it. You just think that's the law. No, I spoke to Mr. Odom. He told me he looked at it. I see. And he also gave us an affidavit that we attached to our amended writ petition. Do we have a copy of that in the record now? The offense reports? Yeah. I believe we do, Your Honor. Okay. I believe we do, because I finally obtained a copy pursuant to Judge Lake granting me subpoena power when I was federal habeas counsel. But they did identify Bauderas, Fugan, and Elvira. Five days before guilt-innocence started, Your Honor. I understand that. Three weeks before the punishment phase. Yes, Your Honor. Guilt-innocence was not the big issue in this case, was it? It was contested, Your Honor. But I think the strongest case, the most critical issue was punishment. Right. But I finally obtained the Fugan and Elvira transcript. It took me about six weeks to actually get a copy of it, because I had to request it from the Court of Appeals. But you were acting years later. Yes, Your Honor. I mean, but they knew before trial, didn't they, that Fugan and Elvira had already been convicted? No. They did not know that. They didn't know the name. They didn't know Mr. Bauderas' name, despite asking for it, didn't know Mr. Fugan's name, didn't know Mr. Elvira's name. So there was no way to look it up. Can you say those other names clearly? I can't. I'm having trouble. I'm sorry, Your Honor. Yes. Mr. Fugan, Mr. Odom, the trial counsel, did not know Fugan's name, did not know Mr. Elvira's name, did not know the informant David Bauderas' name, despite asking for that information repeatedly. And without that information, you couldn't locate the case among the thousands of robbery cases in Harris County on any given year. So Mr. Odom, because they disclosed it. When did you enter? Did you enter the case at State Habeas? No, Your Honor. I was not State Habeas Counsel. I was appointed by Judge Lake as Federal Habeas Counsel. So it was about 2015, I believe. Well, did State Habeas Counsel have an opportunity to discover this braiding material by the time of the Habeas? Perhaps they did, Mr. Fugan. When did State Habeas occur? Your Honor, State Habeas was filed 4-21-99. That was the filing deadline. And Mr. Bauderas, for example, his federal sentencing where it was finally disclosed that he was a longtime HPD informant was not until July of 1999. After all, direct appeal and State Habeas filing deadlines had passed. So that's Mr. Bauderas. But Fugan and Elvira, I mean, that's just one piece of many different pieces of Brady evidence that was suppressed. Mr. Bauderas' longtime status as an HPD informant, which is the Banks v. Dredge facts, that was not disclosed until 1999, unless you were specifically looking for that federal sentencing of Mr. Bauderas who was convicted for drug trafficking in federal court in Brownsville. Am I correct that the district court didn't consider this in terms of lack of notice of these other witness, these other, these LegCo conspirators' names, lack of timely notice? He didn't consider that a significant problem, right? Yes, Your Honor. You're talking about the state trial court. No, I'm talking about Judge Lake and his denial of, because as I recall his, I've got a copy of his opinion here, but as I recall it, he was concerned about Bauderas for the same reason as the new trial judge was, which was the fact that he had signed a contract pertaining to another case and had completed his informant work on that case. So it didn't affect Dennis' case. That was the CCA's finding, Your Honor. However, that finding clearly contradicts U.S. Supreme Court law, which is Delaware v. Van Arsdell and also Davis v. Alaska. Well, but it doesn't, it, the CCA is affirmed, reaffirmed by Judge Lake. Is it not? He was, and I think with all due respect, Your Honor, Judge Lake, I believe, was incorrect for the reasons I pointed out in my federal writ petition, which is that Delaware v. Van Arsdell and also Davis v. Alaska, which was cited by Delaware v. Van Arsdell, says you have a witness, and the facts in Delaware v. Van Arsdell were exactly like this case, where you had a witness who had criminal charges dismissed prior to trial that was not disclosed, and the Supreme Court held that, that that, the failure to disclose that violated Van Arsdell's confrontation rights because he had a right to attack the witness for his bias, impeachment bias. So what do you say, what does that pertain to here? It pertains to the state trial court's ruling, Your Honor, and also Judge Lake's ruling, that the failure to disclose the contract and the dismissal of the felony marijuana charge before Mr. Dennis' trial was of no moment, and that CCA ruling and also Judge Lake's ruling was incorrect, clearly, under Delaware v. Van Arsdell and Davis v. Alaska, because those cases held that you have a confrontation clause right to impeach a witness for bias. Do you have to show that that was suppressed up until the time of the state habeas? Well, I don't believe so, Your Honor, because that was exhausted, that claim was, the failure to disclose the contract and the failure to disclose the dismissal of the marijuana case on the informant, Balderas, that was the subject of a direct appeal claim that was denied. That was preserved, exhausted, litigated, lost. And the reason the CCA said it was lost was because the conviction was not admissible under Texas state law, Texas rules of evidence, because they were not convictions. Of course, that finding violates Delaware v. Van Arsdell, because it's admissible as impeachment bias of that witness, who Mr. Balderas was a witness to on the future dangerousness issue. The district court said it was not impeachment material, isn't that right, because it didn't give Balderas any reason to fabricate any testimony against your client? That's what the state trial court ruled, Your Honor, and that directly contradicts Delaware v. Van Arsdell and Davis v. Alaska. I mean, that's the holding of Delaware v. Van Arsdell, that a dismissed criminal case before the witness's testimony, even if it's dismissed, is impeachment, bias impeachment evidence, and you have a confrontation right to confront that witness with that information. That's why it's required to be disclosed under Brady, because it's material. When was it? Was it at 99 that the Judge Hinojosa? Yes, Your Honor, July of 99, when Mr. Balderas was sentenced in federal court in Brownsville. He said Balderas was a dirty informant? He was a worthless witness, was the quote, Your Honor, because he was a corrupt informant who was out committing crimes. When did the defense obtain that information? I obtained it when I finally investigated further Balderas when I was appointed as federal counsel. However, state habeas filing was already over at that point. The deadline had passed, as had passed the filing, the state direct appeal filing. So if they'd obtained that information at that point, it would have been considered a successor and time barred under state law, because it was past the deadline, the filing deadline. Well, I thought state law always allows omission of new evidence. I'm not sure it always does, Your Honor. Well, maybe not always. Maybe if it had gone to guilt. Now, as I understand it, that at the motion for new trial, the state says that Dennis' counsel brought up the name of Mr. Muneer, who was Balderas' attorney. Yes, that's correct, Your Honor. Was there any reason why Balderas' attorney could not have told Dennis that his client was a longtime informant? I don't know that, Your Honor. I tried to interview Mr. Muneer. He passed away many years ago. I spoke to his wife, who's a retired judge in Houston, and tried to obtain his case file. She said they had disregarded it years ago because he passed. Yeah, but the question is not what you could have found out. It's the question what trial counsel could have found out when he was making the motion for new trial, right? Well, that assumes Mr. Muneer would actually disclose that his client was an informant. Well, that's why I started out by asking you the question, is there any reason you can think of why he wouldn't have disclosed that? Well, there are a lot of reasons, Your Honor, because he's representing a longtime informant, which he said he'd been doing since 1989 when asked by the police to represent their guy. Well, that's precisely my point. If you're saying the police are suppressing this, but trial counsel for Dennis knows the trial counsel for Balderas, and that's how he apparently got the contract. No, that's not how they got the contract. That's not how he got the contract, but he mentioned he knew counsel at the time of the motion for new trial hearing. Well, you know, trial counsel obviously was relying on the representations by the Harris County District Attorneys that they would comply with Brady, which they promised to do. And those counsel were present during the motion for new trial hearing, and they did not volunteer or correct the record or disclose the fact that Mr. Balderas was a longtime HPD informant, something we didn't find out until 1999. So I wasn't present during that time, but Mr. Odom, who provided an affidavit for this court reattached to the federal, amended that he didn't know anything about Mr. Balderas being an informant. And in fact, Mr. Balderas denied having any ongoing relationship with Houston Police Department. He denied, in fact, that he had had any charges dismissed recently at Mr. Dennis' trial, when he in fact had. Okay. Where does that leave you under Banks v. Dredge? Your Honor, I believe Banks v. Dredge provides cause and prejudice for, if you establish the Brady suppression or Giglio suppression, which we also have here, false testimony left uncorrected by Mr. Benson, the Harris County DA during the motion for new trial. Banks shows that if you establish a Brady claim, that establishes cause and prejudice for the procedural default. Automatically? Well, Your Honor, I mean, that's what the holding of Banks is, that if you establish a Brady claim citing Banks, that also simultaneously establishes cause and prejudice. I mean, don't you have to show that that occurred before . . . Well, why wasn't that problem cured by the passage of time before the state habeas proceeding? During that time, could the defense attorneys have . . . Well, they couldn't have found out that Mr. Balderas was an HPD informant because that was never disclosed. I don't know how you would find that out until his attorney admitted it in his federal sentencing hearing. So his long nine-year career as an informant, during which he allegedly continued to commit crimes, that was not known to the defense even before the state habeas. No, Your Honor, that was not known. Yes, but the thing was pending at the Court of Criminal Appeals until the early 2000s, right? I believe it was, Your Honor. It was definitely in the state courts in 1999, right? The case was pending in the state courts. I believe it was for . . . It had to be because it was either on direct appeal or on state habeas because that took 16 years. So the fact that they couldn't . . . that they didn't . . . They found this out in 1999. They would have been able to file . . . His counsel would have been able to file some supplemental pleading or whatever in state courts, wouldn't they? No, it would be the time barred at that point, I believe, Your Honor. But if it was sitting before the Court of Criminal Appeals, you know, you can always . . . I'll bet you anything the Court of Criminal Appeals . . . You file a supplemental brief based on newly discovered information, and I'll bet you the Court of Criminal Appeals is going to take cognizance of that. I'm not sure that they would. In 1990 . . . You tell them there might be arguments about whether you had the proper information, but anyway, okay, we'll just have to look it up for ourselves and listen to the state. Move on to the Fugan and Elvira situation, please. Well, Your Honor, those witnesses also contradicted Mr. Balderas in various ways about who was involved in this home invasion that featured in Mr. Dennis' punishment phase. So that information, because it was disclosed so late and was a 982-page transcript, which took me quite a while to digest that and find where in the 982 pages there are the various Brady issues of Fugan and Elvira contradicting Mr. Balderas' version of what happened in that offense. You were looking for not just a needle in a haystack, you were looking at a haystack without a needle. I mean, the fact that . . . Is it Fusan? Fugan, Your Honor. He testified that Balderas was a fantasy. He did? So the negative implication of the Tsang home invasion case and transcript was that it did not mention Dennis and Balderas was a fantasy. So it really didn't corroborate Balderas' testimony against Dennis. In fact, it contradicted it. Contradicted it. If you had had that at trial, you supposedly could have destroyed him as a witness during the penalty phase and might have gotten a life sentence. That's your best argument, I guess. It wasn't just, of course, Fugan and Elvira contradicting Mr. Balderas. It was the fact that Balderas was a dirty informant. You know, when you do Brady-Kiles materiality analysis, you must do a cumulative analysis of all suppressed material Brady information. And when you add it all . . . State habeas counsel's diligence. But I guess the state is going to argue that during that time before the state habeas was filed . . . Well, Your Honor . . . . . . the counsel had enough to go on to find all of this out, I guess, is the argument that the state will make. Well . . . So you're . . . The direct appeal counsel did raise the information that they had regarding the failure to disclose the dismissed case for Mr. Balderas and also the failure to . . . the dismissal of the felony marijuana charges. So that which they did know about, they were able to . . . and did exhaust. The most critical information, I think, frankly, is the fact that Mr. Balderas was a long-term corrupt informant, which Judge Inhofe rightly found made him a worthless witness. And that was not available . . . I mean, you would literally have to find a needle in a haystack, and I essentially just stumbled upon it. But the . . . But, you know, Cullen v. Penholster says the federal courts are normally supposed to rely on the state court record. And under the . . . under AEDPA, you can only offer new evidence if it would convince a reasonable jury that the defendant was not guilty. Well, Cullen v. Penholster doesn't apply in this case, Your Honor, because the claim that we presented, with all the additional information we presented, that claim was not adjudicated on the merits in state court. And, therefore, 2254D doesn't apply. You mean the . . . Balderas was presented on the merits? Part of it was. Part of it was. The fact that he was a long-time informant was not presented. The fact of Mr. Vinson's misrepresentations to the trial court during the motion for the prosecutor, Mr. Vinson, his misrepresentations to the trial court during the motion for new trial hearing, that there was no ongoing relationship with Balderas. And the trial court said, and I pointed that out in our amended writ petition, the trial court said if there had been an ongoing relationship with Balderas, that his . . . he probably would have granted the motion for new trial. But because there was no ongoing relationship . . . Which judge was that? This was the trial judge, Your Honor, in the motion for new trial in 1997, which was a couple of months after the penalty phase. And that quote is pointed out in my amended writ petition. Sorry? It's pointed out in my amended writ petition, Your Honor, and I could . . . Okay. Is that your argument also about Fugan and Elvira? I'm sorry, Your Honor. I say, do you say Cullen doesn't apply with regard to Fugan and Elvira for the same reason? I'm not sure the court can claim split and find some parts exhausted and other parts unexhausted, I think. Well, these are very separate suppression claims. They're all . . . With very separate answers on the . . . You know, because the state points out that you . . . Trial counsel did, in fact, know who Fugan and Elvira were, and trial counsel, and those cases were on appeal. Well, Your Honor, Strickler v. Green says that both state habeas counsel and direct appeal counsel are allowed to rely on the state's representations that they have disclosed Brady and complied with their Brady . . . I'm not . . . I have a . . . It's a much simpler . . . They knew . . . Trial counsel knew before he went to trial that the names Fugan and Elvira from that report . . . Yes, Your Honor. Okay. And he provided in his affidavit that in that short period of time it was not reasonably practicable for him to pull a 982-page transcript while he's preparing for the beginning of a capital murder trial and digest that information and then investigate and interview witnesses further, locate them and interview them so as to develop this information. It just simply was not enough time, which is why they asked for it six months before and why Mr. Vinson said in January 1997 . . . Actually, it wasn't clear to me that they requested the trial transcript at all until after the trial had concluded. Well, I believe Mr. Odom said at the time that his investigator, Mr. Guidoni, and I believe this is in the motion for new trial hearing, when he asked for a continuance of the trial in order to investigate the Balderas information, that they did not have enough time to adequately investigate that. He didn't . . . He did not ask for a continuance between the time when the State gave him the offense report in the case because at least the State says that because he had . . . It was before that, all of which the trial court had granted. And yet in this instance, they didn't even seek a continuance. Actually, Mr. Odom did seek a continuance, Your Honor, based on the late Balderas' disclosures and he was denied. I believe once he was denied the first time, right after that information was disclosed, he . . . Can you tell me where that is in the record? Or you can think about it with your red lights on. Yes, Your Honor. Okay. Thank you. Would the Court like me to provide that later? It would be helpful. Yes, Your Honor. This is where the defense trial counsel asked for a continuance? Yes, Your Honor. After being informed about that? Yes, it's in the . . . Balderas and the other two? Yes, Your Honor, he did. And that was in the pre-trial hearings right before the start of the guilt innocence. I will supplement with the following disclosure, Your Honor. All right. Thank you, and you have time for rebuttal. Mr. Nassar. May it please the Court. Yes, sir.  The lower court found that Dennis Balderas' cooperation with law enforcement in a wholly unrelated case was not material under Brady and that Dennis' vore dire claims were without merit. The lower court considered Dennis' adjudicated claim as well as his newly presented arguments and found that the CCA did not unreasonably apply Brady. Because this determination was not debatable, this Court should deny COA. The CCA's materiality determination was not unreasonable for three reasons. First, any impeachment evidence against Balderas would have been cumulative. Second, there was circumstantial evidence to corroborate Balderas' link of Dennis to the extraneous offense. And third, Dennis has not pointed to any Supreme Court precedent that would indicate that the CCA unreasonably applied Brady. Turning first to what was raised in State Court, Dennis raised two separate Brady claims. The first alleged that the State withheld evidence that Balderas had charges against him dismissed and the second alleged that the State withheld evidence that Balderas had a contract with the State in an unrelated case. The CCA determined that these dismissals would not have been admissible under the Texas Rules of Evidence as prior bad acts and that the contract was not material under Brady because it did not provide Balderas with any incentive to testify. What you're talking about was not material dismissal? Well, in State Court, it was filed under seal was a contract that Balderas had with the State in an unrelated case that had been completed months before the trial against Dennis. They're not complaining just about that. They're complaining about a long nine-year relationship with the Houston Police Department that Balderas had, supposedly. That does appear to be what this new information presents. And again, as Judge Jones noted, this would be barred under pinholster because it was not provided in State Court. And therefore, it doesn't go to the D1 determination of the adjudicated claim. And this is indeed the same claim. It was pled as the same claim. And there has been no argument that it's an unadjudicated claim in the Federal District Court or that banks should overcome any default of that unadjudicated claim. So with regard to that, it is barred under pinholster. However, it should also be noted that the CCA knew that Balderas had at least had an informant contract, but it determined that because this informant contract did not give him any incentive to testify against Dennis, it simply would not have been material under Bravey. And the CCA did not indicate that the extensiveness of his informant relationship was necessary to decide this case. They simply looked to the fact, is he getting a benefit in this case? And nothing in the sentencing transcript that Dennis now provides disputes that fact. In fact, it reinforces that fact because Balderas' own attorney states on the record that he didn't get any consideration to testify against Dennis. So actually, this pinholster barred evidence not only can't be considered, but it reinforces the very fact that the CCA disposed of this case on, which is that Balderas did not receive any incentive to testify against Dennis, and Dennis has pointed to no Supreme Court precedent that would indicate that this is an unreasonable application of Bagley materiality. Of course, what they're saying now is that the suppression continued after that to the extent that they were unaware that Balderas was a long-term informant, as Mr. Muneer told Judge Hinojosa a couple years later. Yes, and it appears that now the concern is simply the extensiveness of the informant relationship. However, I think the CCA made clear that that was not the dispositive question that was before them. Well, but they didn't, that issue was never, that aspect was never presented to the State courts at all. That is correct. The length of his informant relationship and the extensiveness of that relationship was not presented in State court, and evidence of that extensive relationship was not presented in State court. And therefore, it can't be used to consider the reasonableness of the CCA's determination. Well, but the question is whether it was suppressed from Balderas, yeah, Dennis, during these proceedings. Yes, Your Honor, and again, under Penolsa, there isn't a suppression exception to this, but to the extent that my colleague is now arguing under Banks that it is an unadjudicated claim, it is worth noting that Mr. Muneer was present at the motion for new trial hearing and clearly communicated with Dennis' appellate counsel, and Dennis' appellate counsel is ready and willing to proffer the testimony of Mr. Muneer to talk about Balderas' informant contract. I knew I'd have seen that. Do you have sights that's in the new trial hearing? Yes, Judge Jones, if you just give me one moment. It's in the motion for new trial hearing. We'll look it up. I actually do have it. It's ROA 11946. Say it again. ROA 11946, Your Honor. 11946. Yes, Your Honor. And appellate counsel for Dennis states Mr. Muneer would testify that there was a contract and the contract was in terms of whether it was going to be fulfilled. And so it defies credibility that they had not talked to Mr. Muneer about Balderas' informant relationship with the State at that point, or that with due diligence they couldn't have asked him questions about the extensiveness of Balderas' informant relationship. And so I think at that point we believe it's Penal Subordination. There's no exception. But to the extent that Dennis is now arguing Banks, this is where I think you, Judge Dennis, touched on whether or not Banks would be co-extensive with suppression. I don't think it would be co-extensive here, because while trial counsel did not know about the fact that Balderas was an informant, clearly appellate counsel at least knew about an informant contract and was at least in contact with his attorney about the fact that he was an informant. So in that case, the suppression did not cause any procedural default, because with due diligence they could have asked Balderas' attorney about the extensiveness of his relationship. Of course, it would have been much better if the D.A. had just fessed up originally, right? Absolutely. I don't dispute the fact that it's certainly not ideal that this informant relationship was not disclosed. But again, that's not the question here. The question here is simply whether or not the evidence that was presented to the CCA for this one adjudicated claim was material. And more than that, whether or not their determination that it was not material was an unreasonable application of federal constitutional law in the year 2000. And the most Dennis can muster is a Sixth Circuit case from 2010. And given that fact, he simply fails to meet his burden under AEDPA, and that is simply not debatable. In turning now to the fact that any impeachment evidence against Balderas would have been cumulative, Balderas was impeached at trial for his bias in favor of the state, and he was impeached because he had committed this home invasion, and defense counsel extensively cross-examined him on the fact that he might not be charged for this home invasion if he testifies in the way the state wishes. Who is this now? Is this Balderas you're talking about? Yes, Your Honor. And I believe I have an ROA site for that as well, and... Excuse me. Yeah, excuse me. It's ROA 11539 in which defense counsel... Who is that? I'm sorry? Would you give me his name? Defense counsel? Mr. Odom. Mr. Odom cross-examines Balderas saying he says, what do the district attorneys tell you that your deal could be? He says they don't make no deals. They just said for anything I say, I'd get immunity for burglary. They told you that anything that you say you're going to get immunity for being involved in that burglary? Correct. And what is your understanding that that means? That maybe I won't get charged? Now, this is at the penalty phase, or is it later? Yes, Your Honor. It's at the penalty phase of trial. And so this was disclosed to the jury, and I think at that point, any additional evidence that Balderas had an incentive to testify in favor of the state would have merely been cumulative. And I think as this Court found in Felder, their... Cumulative of what? It would have been cumulative of whether or not Balderas had an incentive to testify in favor of the state. Where a reason for doubting a witness' credibility has already been furnished for one basis, an additional basis for that is cumulative, and then therefore is not material. I'm sorry, what did the jury hear that you say was enough, and could... everything else would have been cumulative? What the jury heard was that Balderas had a significant incentive to testify in favor of the state, because he was hoping he would not get charged. Can you speak a little slower? Sure. Yes, Your Honor. The jury heard Balderas state that he had committed this home invasion burglary, and that he was hoping that in exchange for his testimony, he would not be charged for that burglary. And he was extensively cross-examined on that point. And he actually admitted he had never been charged. He did admit that he had never been charged. And Fugon testified he was a fantasy. That's correct, Your Honor. However, in turning now to the Fugon-Elvira trial transcript, while Fugon did deny that he had ever known Balderas, his denials in that trial were completely not true. Both denied committing the crime. However, the sayings both identified them as the home invaders. And I think there was some line of identification there, too. More than that, Fugon's semen was found inside the saying residence. That was not presented at Dennis' trial, but it goes to the lack of credibility in his denial of committing the offense. Was Balderas' name in the criminal report? I believe it was. I can't remember the offense report, but Fugon and Elvira both provided written confessions to the home invasion. And in that written confession, Fugon names Balderas, says his name, and says that he was conspiring with Balderas and two Cubans, which would presumably be Rinaldo Dennis and his brother, Alberto Dennis. That's in what, the report? That's in the written confession, which is also in the record, Your Honor. Yes. But I mean, that was in the offense report. Those confessions were in the offense report that Mr. Odom was allowed to view before the trial commenced. I'm not sure if those were in the offense report. I don't know if they were. Were they made available to him at all? They could have been available because they were exhibits in the Fugon and Elvira trial. And therefore, to the extent that they were provided, I believe the transcripts for the Fugon and Elvira trial were given to the Court of Appeals in April of 1997, five months before Dennis's trial. And therefore, they were made publicly available and they were available for inspection. And to the extent that this would have in any way been exculpatory or impeaching, first, it's unclear how Fugon would have ever even testified here. The State tried to bench warrant Fugon to testify. They wanted Fugon to testify instead of Balderas, but Fugon's conviction was on appeal, and therefore Fugon's attorney said he would not testify. He would invoke the Fifth Amendment if he was asked to testify because his conviction wasn't final yet. So the State was trying to get Fugon to testify, and Fugon's lawyer said no, and Dennis provides no argument as to how he would have therefore gotten Fugon to testify. And more than that, if he had testified and he had made these wholly non-credible denials, it seems an almost certainty that at that point the State would have devastated Fugon's testimony with the corroborating written report. And then the jury would have had in front of it a written confession in which Rinaldo Dennis talks about David Balderas and two Cubans setting up this home invasion, and it would have just further corroborated all the evidence. Who is that? Rinaldo Dennis? Yes, Your Honor, the defendant. And therefore, introducing this... Excuse me. Okay. Just tell me again. Where does this appear that Dennis... The written confession, Your Honor? Yeah. The written confession... It's Croussant's confession? Yes, Your Honor. It names Dennis? It does not name Dennis. It does, however, say David told us that he has two Cuban friends who are jewelers, and they have been watching this man for a few months. They have told David that he carries a large amount of diamonds around, and he keeps them at his house. The Cubans knew what time the man was coming home. The jury heard that Rinaldo Dennis had committed this crime with his brother, and that Rinaldo Dennis was a Cuban. And I think it's... That's not in the confession. That's Balderas' testimony, right? The fact that... But you were just quoting. No, Your Honor. That is Fugon's written confession. Oh, Fugon's confession. Yes. And I think the fact that it can be confused with Balderas' testimony highlights just how corroborative this would have been. If they had brought Fugon to testify, and then this written confession came in, it would have corroborated everything that Balderas said and would have reinforced to the jury that Dennis was, in fact... It would not have implicated Dennis, would it? I believe... Not directly, but it certainly would have corroborated... Substantially corroborated. It certainly would have corroborated to the extent that there were Cubans who knew about the diamond business. That's correct, Judge Jones. And I think it defies credibility to think that the jury... Right, and that have an almost modus operandi of conducting these armed robberies of diamond wholesale dealers. And so with regard to the Fugon L. Vyra trial transcript, I think because it was publicly available, it was not suppressed. And because this clearly would have backfired, it simply was not material. And then finally, it is again penalstirbarred under D-1 because it has never been pled as a separate unadjudicated claim. When did the Fuson case... When was it tried? The Fugon and L. Vyra were tried in a joint trial. I believe it was somewhere around the fall of 1996, which would have been a calendar year before Dennis' trial. And... So there would have been a transcript by that point, you think? Yes, Your Honor. And Dennis presents that transcript as an exhibit to his amended petition. And the file stamp date on the Court of Appeals for the transcript says, I believe, some date in April 1997. So it was generated. It was available on appeal. And therefore, the only question is whether or not Dennis could have gotten that in three weeks. But again, and this goes to whether or not there was due diligence on his part of finding these transcripts. He didn't ask for any investigatory help from the court to let the court know, I need another investigator. And the court admonishes Dennis' trial counsel for not seeking investigatory help if he needed it. And so I think it's clear that with respect... Where did the court do that? I think that this is... I don't know if I have an RRA cite for this one, Your Honor. I think it is... Well, is it at a pretrial hearing right before trial or during trial or what? I believe it is at punishment because the court deferred ruling on whether or not it would come in. And so I think it's around the 34th reporter's record volume where it's in the middle of the punishment phase. Volume 34 of the reporter's record. I don't know if I have the exact concite to that. And he does say if you wanted investigatory help, all you have to do is ask me, but you didn't ask me. And so with regard to the due diligence requirement under Brady, clearly there was no due diligence exercised here. And I'd like to also turn back to the fact that in addition to going back to the adjudicated claim with regard to Valderez's informant contract, in addition to the fact that any impeachment of Valderez for his bias in favor of the State would have been cumulative, there were corroborating circumstances that didn't directly link Dennis to the extraneous offense, but they did corroborate Valderez's link of Dennis to the offense, namely Rachel Ohayon who was the intended target of the home invasion. It comes out that they actually invaded the wrong home. And Rachel Ohayon, who they were trying to rob, testifies. How do you spell that? Ohayon. I think it's O-H-A-Y-O-N. And Ms. Ohayon testifies that her and her husband are both diamond wholesalers who work for MGI Jewelry, which is a company that Rinaldo Dennis just happened to work for six years prior. So there was a link between Dennis and the intended targets of this home invasion. Where was she testifying to this? She testifies to this. Excuse me, Your Honor. That was during the punishment phase. Yes, Your Honor. It was during the punishment phase and it's R-O-A-1-1-5-7-9. And... Okay, I'm sorry. I interrupted you. No problem, Your Honor. So in her testimony, she testifies that her and her husband work for this company that Rinaldo Dennis happened to also work for. And more than that, there were substantial similarities between the underlying capital offense that the jury had concluded that Dennis committed and the extraneous offense, such that they could have concluded that Dennis must have been behind the extraneous offense as well. These crimes occurred a mere two months apart. They were clearly orchestrated by somebody that had an intimate knowledge of the diamond wholesale industry. And they were both armed robberies that targeted diamond wholesalers that were linked to Rinaldo Dennis. How much of that did Ms. Ohan express in her testimony? Are you just inferring that? I'm unclear on that. Ms. Ohan, what she told the jury was that she had worked for this diamond company and that... That Dennis also worked for. That Dennis had worked for six years ago before the offense. And so that provides a link between the intended target and Dennis. And on top of that, the jury heard during guilt innocence that Dennis also had a relationship with the decedent in the principal offense, Mr. Janos Such. What's the name? Janos Such. S-Z-U-C-K or H. S-Z-U-C-S, I believe, Your Honor. It's difficult to spell. Is that the other murder trial, that murder case? That is the victim of the underlying principal offense. And so the jury heard from Ms. Ohan that he intended to rob this home that had diamond wholesalers that worked for the same company he worked for. And then they also heard during the guilt innocence phase that he had a connection to Mr. Such, the man that he had killed at guilt innocence. And he has this clear, almost modus operandi of seeking out when these diamond wholesalers are coming back with their inventory, because there was testimony that I think Mr. Such had just returned from a trip. And then there was also testimony that he was targeting Mr. Ohan when he returned from the airport because he knew that he flew to New York to get his diamond inventory every Thursday night. So I think the jury was entitled to believe Balderas by saying these crimes look eerily similar. There's clearly some pattern here. And I have no reason to disbelieve this witness at this point. And that's likely the reason they believed him, despite him saying, I have an incentive here. What was the first point at which trial counsel for Dennis ascertained or could have or should have ascertained the names Fugan and Balderas Fugan Elvira? I believe it's August 13, 1997. Right. Okay. That's when the offense report, the extraneous they offered, said we're going to offer extraneous crime evidence at punishment, and here's what it is. Right? Yes, Your Honor. Five days before trial. Yes, Judge Dennis. Five days before trial, but notably three weeks before punishment began. And the CCA, there was an unfair surprise claim raised on direct appeal, and the CCA actually made a ruling that he did get timely notice to investigate that offense. And that factual determination is still entitled to deference here. And while it was five days before trial, he had three weeks to investigate it. What date was that, that was five days before trial? August 13. August 13? Yes, Your Honor. August 13, 1997. And what was the status of Fuson's case and transcript and all that? I believe it was pending on appeal because Fugon's lawyer said that was the reason he wouldn't testify, because he still had a Fifth Amendment right. And of course, as I previously mentioned, the transcript was available in the Court of Appeals as early as April of 1997. And turning again to what the CCA's ultimate determination was, that this informant relationship would not have been material under Bagley and under Brady, again, Dennis points to no Supreme Court case, either now or in the year 2000, that would indicate that that is an unreasonable application of Brady. Okay. As I apprehend Petitioner's argument, what he says here is that the State suppressed the evidence that Balderas was a longtime informant and that he did not raise it or counsel did not raise it in the State courts because they didn't know about it until this counsel got involved, and that under the Banks case, this provides basically mirrors the cause and prejudice and overcomes the procedural bar. Yes, Your Honor. I think that appears to be his argument today. However, that argument has never been presented. It was presented in the district court as one large Brady claim, and while Dennis cited to Banks, there was no mention of Banks being used to overcome a procedural default for... Well, I don't think you have to... You know, we have to dig into the law ourselves sometimes. So I'm sure this counsel was astute enough to say cause and prejudice, right? I don't know if he says it with... I believe he says it in his COA application with regard to the defaulted claim that Judge Lake pointed to. But that was a different claim. That was the claim that Balderas actually did receive an incentive to testify against Dennis. Judge Lake said to the extent that he's arguing that, I find that defaulted because it wasn't raised in State court. And then Dennis raised Banks to show cause and prejudice to overcome that. I apologize if I'm incorrect about this, but I don't think anywhere in the pleadings has Dennis said that this isn't... that the informant... the sentencing transcript is used to prop up an unadjudicated claim. Well, even, you know, take that... take that as our assuming arguendo that that is the law. What does the Banks case say about the situation? Yes, Your Honor, absolutely. And if this were under Banks, cause would not be coextensive with suppression because appellate counsel clearly knew or should have known by simply talking to Mr. Muneer, who was available at the Motion for New Trial hearing, that Balderas had an informant relationship of some kind with Harris County. And it defies credibility that appellate counsel either did not or could not have asked what the extent of that relationship was. And under Banks, the suppression occurred throughout the State habeas process and that was why the cause was coextensive with suppression because the suppression caused the procedural default. It did not here because, in effect, a very similar claim was raised on direct appeal that Balderas was an informant because he had this informant contract. And for that reason, Banks would not apply. However, materiality and prejudice would be coextensive here because there's, again, is no materiality because Balderas was already impeached on the fact that he had an incentive to testify in favor of the State to avoid a charge for a home invasion burglary. And the jury still chose to believe him, likely because what he said was so corroborated by the similarities between the underlying capital offense and the extraneous offense. And if there are no more questions on the adjudicated Brady claim, I would like to quickly turn to the defaulted claim that I just mentioned that Judge Lake determined was procedurally defaulted, that Balderas actually did receive a benefit to testify against Dennis. Again, this was not raised in State court. No argument under Banks was presented in district court to overcome the default of that claim. And again, it is speculative, conclusory, and belied by the record as Balderas' own attorney in the sentencing hearing states that Balderas never received a benefit for testifying against Dennis. If there are no more questions. Do you have any questions, Judge Dennis? I have some, but I think it would take me too long to articulate them all. Okay. Thank you. For these reasons, we ask that this Court deny sealant. Yes, sir. Did you have questions? Mr. McGuire. I may proceed with rebuttal. State is arguing that we've pointed the Court to no precedent, including the trial court, excuse me, Judge Lake at the Federal District Court, no precedent to show that the CCA's ruling is true. But Van Arsdal was a different case, though, because in Van Arsdal there definitely was a deal. There was a benefit conferred. So that's really a different case from what you have here. Well, here there was a benefit conferred, Your Honor. The felony marijuana case was dismissed. And according to Balderas' testimony, that was for his cooperation on another case. But nonetheless, it shows the relationship between the State and their witness. But as a defense counsel, surely you support the Texas procedural rule that says you can't introduce dismissed charges. Well, that may be true under the rules of evidence, Your Honor, but there's a constitutional confrontation right that trumps the Texas rules of evidence as found by the Supreme Court in Davis v. Alaska. Do we have any, I mean, I thought I had heard of most rules by this point in time, but where's something that states that in the Fifth Circuit? Well, I'm not sure. I know the Fifth Circuit decided Davis v. Alaska, which, in that case, the state law in Alaska prohibited getting into juvenile probationary records, and the Supreme Court held that that state evidentiary rule violated the confrontation right to impeach a witness who had had favorable treatment from the state. I guess I didn't under, I mean, I looked this up in your brief while you were speaking, and it appears on page 62, so it, anyway, I didn't understand the importance you're attaching to that at this point. Well, I mean, the direct appeal counsel raised exactly this point on Davis v. Alaska in their motion for reconsideration to the CCA. It was also raised during the motion for new trial, so this was presented to the state courts, and nonetheless, the CCA cited the Texas rules of evidence as to why they could I didn't see that argument in your briefs at all. But, anyway, I'll go back. Because you were arguing it all in terms of suppressed evidence, I didn't think you were arguing it in terms of the state courts unreasonably applied governing law, but I'm sorry. I may have forgotten. Do you know where you specifically argued that? Yes, Your Honor, it would be in the amended written. Okay. I read it last night, but it's pretty long. It would be on page 81 of the amended written petition, Your Honor, as a cite to Brady and Delaware v. Van Arsdell. So, regarding their pinholster argument, Your Honor, we believe the new evidence fundamentally altered the exhausted claim that was in front of the state court, and there's cause for the default of that because the state suppressed all this information regarding Mr. Balderas' status as a long-term informant. Judge Inahosa found that Balderas would have been found to be a wholly worthless witness because he was a corrupt informant who was out committing crimes while he purportedly is acting on behalf of the state. Well, I certainly understand that, but how could you impeach a fellow any more than by saying that he's already I'm testifying here on the stand because I'm hoping to get a better deal from the police, and everything, all the surrounding circumstances strongly suggest that he is testifying about A, a crime that was planned to involve a diamond dealer, and B, a diamond dealer who had a previous connection to the defendant in this case. I mean, what could be more impeaching to the jury to know that he's a bad actor than the very circumstances here? Well, the fact that Mr. Balderas had for many, many years engaged in multiple crimes while acting as an informant, and in fact, finally But in 1999, would the police have told you that? I mean, in other words, they probably weren't All you'd have known is that he was a long-time informant, right? Well Because he wasn't sentenced in that colloquy until two years after the trial here. That's correct, but also the fact that he was a long-term informant would have shown that Balderas was committing crimes while he committed the, set up the home invasion robbery while acting as an informant according to his own testimony. Now, Balderas was the only witness presented at Mr. Dennis' trial linking him to that Well, I guess it's Ms. O'Han, but that's circumstantial that there's a link there But again, Mr. Balderas was contradicted in various forms by Mr. Fagon, Mr. Elvira where the jury would have ended up in this that would have been for them to determine In this case, Your Honor, we believe the issue is debatable and because these issues are debatable, we believe COA should issue and we could further brief the merits of this claim You know, we I'm very sorry that I probably might have granted a COA, but if you, well we've got the record and we've got a 90-page brief Well, Your Honor, right now the court has jurisdiction Maybe we should retroactively grant a COA since we've heard the appeal Or is there more that you think you could, what more do you think If the court feels that these claims should be exhausted in front of the state courts, the Balderas-Informant relationship that was never disclosed and all the other things that were disclosed after direct appeal and state habeas, the court could grant COA and stay and obey and remand for exhaustion in the state courts, and we could do that That would be one remedy The other remedy would be to grant COA and allow us full briefing on all of these issues, including all of the exhaustion issues 90 pages is pretty full I mean, you must have asked for a couple of, you know, amendments to get it that long Yes, Your Honor, we did ask for some amendments, but I don't believe we fully briefed anything really other than the COA issue You're suggesting two rulings we could make? Yes, Your Honor, one would be to grant COA and to allow full briefing of this claim The other would be to grant COA and remand to the district court for stay and obey to exhaust these issues before the state courts, now that all this information has finally come to light, despite the state's obligation to disclose all of these Brady issues So the second ruling is ultimately sending back to the state courts? Yes, Your Honor To see whether they would consider the claim under state law Do we have authority to do that? I mean, President I believe this court could remand to the district court and then the district court could grant stay and abeyance to exhaust these claims under Ryans v. Weber Did you ask Judge Lake to do that? No, I did not, Your Honor All right, well, we have your argument and I notice you were court appointed in this case and so you're being paid well below market level and you've done an excellent job and we do appreciate it Thank you, Your Honor Thank you very much We will stand in recess